**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THERESA J. PUTMAN,** | : | **Civil No. 3:15-CV-412** |
| | : | |
| **Plaintiff,** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **v.** | : | |
| | : | |
| **CAROLYN W. COLVIN,** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

This is an action brought by Plaintiff, Theresa J. Putman, an adult individual who resides in the Middle District of Pennsylvania, under 42 U.S.C. §405(g) seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying Ms. Putman's application for disability insurance benefits under Title II of the Social Security Act. This matter has been assigned to the undersigned United States Magistrate Judge on consent of the parties, pursuant to the provisions of 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (Doc. 18; Doc. 19). For the reasons expressed herein, the Commissioner's decision shall be **AFFIRMED**, and Ms. Putman's request for relief shall be **DENIED**.

### I.   BACKGROUND AND PROCEDURAL HISTORY

In 2001, the lives of Ms. Putman and her family were marked by a tragedy, when  Ms. Putman's 23-year-old daughter died of a brain injury she sustained after

having a physical altercation with her husband, while trying to leave him, an altercation occurred in front of Ms. Putnam's three-year-old grandson. (Admin. Tr. 571). Although Ms. Putman attempted to return to work approximately one month after her daughter's tragic death, she reported that she was unable to resume her duties as a result of several psychiatric symptoms that frequently manifested during the workday, including crying spells, severe headaches, inability to concentrate, and panic attacks. (Admin. Tr. 44).

On January 20, 2012, nearly eleven years after this tragic episode, Ms. Putman filed a Title II application for disability insurance benefits. She alleges that as of July 17, 2001, the functional limitations and symptoms associated with the following impairments made it impossible for her to work: anxiety/panic attacks, severe depression, fibromyalgia, and diabetes. (Admin. Tr. 172).

In this case, the period relevant to Ms. Putman's application for benefits in this case is a narrow one. Given the date at which her insured status expired, Ms. Putman must show that she was under a disability between July 17, 2001, and December 31, 2006. Her task in this case is especially difficult given that Ms. Putnam had only limited medical care available between 2005 and 2007 by virtue of the fact that she temporarily relocated to Kuwait with her husband for his employment. Christopher Flynn, the physician who oversaw Ms. Putnam's care while she lived abroad,

2

authored a letter explaining that he could not produce notes from his visits with Ms. Putnam.  He was, however, able to report that he treated Ms. Putman for recurrent major depression, insomnia, and panic disorder with agoraphobia while he held his post at the US Embassy in Amman in Jordan.  (Admin. Tr. 825).  He described Ms. Putman as a "courageous 48 year old woman who chose to live overseas in a Middle East city (Kuwait) during a time of war in neighboring Iraq."  Id.  He also noted that although her symptoms were not in stable remission during their visits, Ms. Putman was determined to accompany her husband to his assignment despite her anxiety and depression.  Id.  Dr. Flynn reported that his personal notes indicated that Ms. Putman had undulating symptoms that had persisted since the trauma of her daughter's death, and at times Ms. Putman was unable to leave her home.  Id.

Dr. Flynn's description of Ms. Putman's psychiatric symptoms as either intermittent or "undulating" appears to be consistent with other treatment notes during the relevant period.  In May 2002, Ms. Putman's treating psychiatrist, Dr. Gregory Montoya, observed that Ms. Putman score an 8.5 (in the normal range of mood functioning) on the Beck Depression Inventory with no suicidal ideation.  (Admin. Tr. 402).  He also noted, however, that Ms. Putman was becoming increasingly symptomatic, and noted several situational stressors that appeared to be causing Ms. Putman a great deal of additional stress.  Id.  In July 2002, Ms. Putman

3

reported that she experienced flashbacks to her daughter's death after Ms. Putman had to be transported via ambulance to the hospital following a gall bladder attack. (Admin. Tr. 400).  Dr. Montoya reported that Ms. Putman had a score of 13 (mild range of depression) on the Beck Depression Inventory with no suicidal ideation.  Id. In September 2002, Ms. Putman reported that she no longer felt dread when leaving her house, and had only "a couple" panic attacks during a six week period (triggered by an unpleasant phone conversation initiated by Ms. Putman's ex-in-laws). (Admin. Tr. 398).  In October 2002, Dr. Montoya noted that Ms. Putman scored an 11  (Mild range of depressive symptoms) on the Beck Depression Inventory with no suicidal ideation.  (Admin. Tr. 396).   Ms. Putman reported one episode of autonomic hyperactivity (hyperventilation) triggered by an angry telephone call from her ex-in-laws.  (Admin. Tr. 396).  In January 2003, Dr. Montoya reported that Ms. Putman scored a 12 (mild depressive symptoms) on the Beck Depression Inventory with no suicidal ideation.  (Admin. Tr. 394).  Dr. Montoya noted that Ms. Putman was increasingly stressed but clinically stable.  Id.  In March 2003, Dr. Montoya reported that Ms. Putman scored a 11 (mild depressive symptoms) on the Beck Depression Inventory with no suicidal ideation.  (Admin. Tr. 392).  Ms. Putman reported that she had been panic attack free for three weeks.  Id.

This reprieve, however, was short lived.  In April 2003, Ms. Putman reported that she had a panic attack after she was diagnosed with Diabetes.  (Admin. Tr. 390).  In June 2003, Dr. Montoya reported that Ms. Putman scored a 14 (mild depressive symptoms) on the Beck Depression Inventory with no suicidal ideation.  (Admin. Tr. 388).  In September 2003, Dr. Montoya reported that Ms. Putman scored a 11 ½ (mild depressive symptoms) on the Beck Depression Inventory with no suicidal ideation.  (Admin. Tr. 386).  Ms. Putman reported that she experienced approximately ten panic attacks over the past twelve weeks, and that these attacks were triggered by stress.  Id.  Ms. Putman also reported that she applied and was interviewed for a job, but that she was not hired after she "wound up crying during the interview."  (Admin. Tr. 386).  In January 2004, Dr. Montoya noted that Ms. Putman was highly stressed, and, therefore, would be more depressed and anxious, and more prone to panic attacks.  Her primary stressor at this time was dealing with the possibility that her daughter's ex-husband could be granted early release from prison.  (Admin. Tr. 383).

In April 2004, Dr. Montoya reported that Ms. Putman scored a 18 ½ (intermediate depressive symptoms) on the Beck Depression Inventory with no suicidal ideation.  (Admin. Tr. 377).  On June 11, 2004, Dr. Montoya reported that Ms. Putman scored a 34 (severe depressive symptoms) on the Beck Depression Inventory with no suicidal ideation.  (Admin. Tr. 375).  On June 25, 2004, Ms.

Putman reported that she recently attended her ex-son-in-law's parole hearing. (Admin. Tr. 373).  On examination she exhibited marked psychomotor slowing and a significantly gloomy affect.  Id.  Ms. Putman also reported that she had mistakenly discontinued Lexapro (prescribed to treat anxiety and depression), and had been off her medication for approximately nine days.  Id.  In August 2004, Dr. Montoya reported that Ms. Putman scored a 40 (severe depressive symptoms) on the Beck Depression Inventory with no suicidal ideation.  (Admin. Tr. 371).  In October 2004, Dr. Montoya reported that Ms. Putman scored a 47 (extreme depressive symptoms) on the Beck Depression Inventory with no suicidal ideation.  (Admin. Tr. 369).  Ms. Putman reported that her depression was substantially related to ongoing stressors including planning her son's wedding, providing financial support to her other son. (Admin. Tr. 369-70).  Dr. Montoya also assessed that Ms. Putman's increasing symptoms could be related to a medication adjustment that was made after Ms. Putman was diagnosed with diabetes, and recommended that Ms. Putman taper off Lexapro and begin Limbitrol.  Id.  In January 2005 Dr. Montoya reported that Ms. Putman scored a 41 ½ (extreme depressive symptoms) on the Beck Depression Inventory with occasional suicidal ideation.  (Admin. Tr. 367).  In February 2005, Dr. Montoya reported that Ms. Putman scored a 51 (extreme depressive symptoms) on the Beck Depression Inventory.  (Admin. Tr. 381).  In April 2005, Dr. Montoya reported

6

that Ms. Putman scored a 33 ½ (severe depressive symptoms) on the Beck Depression Inventory with occasional suicidal ideation. (Admin. Tr. 365). Ms. Putman reported that she experienced only three panic attacks over the last eight weeks, and that none of them were full blown. Id. Dr. Montoya noted that Ms. Putman was much improved when compared to the previous month. Id. In June 2005, Dr. Montoya reported that Ms. Putman scored a 16 ½ (mild depressive symptoms) on the Beck Depression Inventory with no suicidal ideation. (Admin. Tr. 364). Ms. Putman reported few, if any panic attacks, but still had some "weepy days." (Admin. Tr. 363).

During the initial level of administrative review, Ms. Putman's claim was assessed by a nonexamining psychologist Arlene Rattan. On March 1, 2012, Dr. Rattan opined that there was insufficient information in the file to make any decision regarding the severity of Ms. Putman's mental impairment as of her date last insured. (Admin. Tr. 78-79).

Ms. Putman's claim was denied at the initial level of administrative review on March 7, 2012. Ms. Putman requested further review of her claim during an administrative hearing.

On October 4, 2012, nonexamining rheumatologist Margaret Fountain opined that it was reasonable to conclude that Ms. Putman's physical impairments were non-severe (singly or combined). (Admin. Tr. 650).

7

On July 27, 2013, treating psychologist Deborah Snelson completed a Mental Residual Functional Capacity Questionnaire.   (Admin. Tr. 820-22).   In this questionnaire, Dr. Snelson assessed that Ms. Putman would have no useful ability to travel to unfamiliar places, and would be unable to meet competitive standards in the following activities:   maintaining regular attendance and being punctual within customary tolerances; completing a normal workday and workweek without interruptions from psychologically based symptoms; accepting instructions and responding appropriately to criticism from supervisors; responding appropriately to changes in a routine work setting; dealing with normal work stress; understanding detailed instructions; carrying out detailed instructions; setting realistic goals or making plans independently of others; dealing with the dress of semi-skilled or skilled work; and using public transportation.   Dr. Snelson also assessed that Ms. Putman would be absent from work more than four days per month as a result of her impairments.   While these findings were indicative of a significant level of impairment they also reflected an assessment of Ms. Putnam's mental state significantly after the period in which she was last insured for social security disability purposes.   These findings, therefore, had only a limited probative value in determining whether Ms. Putnam had been disabled from 2001 through 2006.

On August 5, 2013, Ms. Putman appeared with her attorney, and testified during an administrative hearing before ALJ Daniel Myers.  Ms. Putman's husband, William David Putman, and impartial vocational expert Marilyn Stroud also appeared and testified during the administrative hearing.  On September 19, 2013, the ALJ denied Ms. Putman's claim in a written decision.  Following the ALJ's denial, Ms. Putman requested review of her claim by the Appeals Council of the Office of Disability Adjudication and Review.  On December 31, 2014, her request was denied, making the ALJ's August 2013 decision the final decision of the Commissioner subject to judicial review by this Court.

On February 25, 2015, Ms. Putman initiated this action by filing a complaint in which she alleges that the findings of fact in the Commissioner's final decision are not supported by substantial evidence and are contrary to the law and regulations. (Doc. 1 ¶7).  As relief, she requests that this matter be remanded to the Commissioner for a further hearing.  On May 20, 2015, the Commissioner filed her answer to Ms. Putman's complaint.   The Commissioner contends that the ALJ's decision is supported by substantial evidence and was made in accordance with the law and regulations.  (Doc. 8 ¶8).  She argues that the final decision denying Ms. Putman's claims should be affirmed.  Together with her answer, the Commissioner filed a

certified copy of the administrative transcript, including all of the evidence that was available to the ALJ when he issued his decision.

This matter has been fully briefed and is now ripe for decision.  (Doc. 13; Doc. 16).

## II.   LEGAL STANDARDS

### A.   SUBSTANTIAL EVIDENCE REVIEW – THE ROLE OF THIS COURT

When reviewing the Commissioner's final decision denying a Social Security claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. § 405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F.Supp.2d 533, 536 (M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  But in an adequately developed factual record, substantial evidence may be

"something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F.Supp.2d 623, 627 (M.D.Pa. 2003). The question before this Court, therefore, is not whether Ms. Putman is disabled, but whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014)("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.")(alterations omitted); Burton v. Schweiker, 512 F.Supp. 913, 914 (W.D.Pa. 1981)("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990)(noting that the scope of review on legal matters is plenary); Ficca, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

## B.    INITIAL BURDENS OF PROOF, PERSUASION AND ARTICULATION FOR THE ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a).   To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.   42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a).   To receive benefits under Title II of the Social Security Act, a claimant must also show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured.   42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process.   20 C.F.R. §404.1520(a).   Under this process, the ALJ must sequentially determine:   (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant

is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between steps three and four, the ALJ must also assess a claimant's RFC.  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §404.1545(a)(2).

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work.  42 U.S.C. §423(d)(5); 20 C.F.R. §404.1512; Mason, 994 F.2d at 1064.

Once this burden has been met by the claimant, it shifts to the Commissioner at step five to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.  20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

13

The ALJ's disability determination must also meet certain basic procedural and substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

## III.   DISCUSSION

### A.   THE ALJ'S DECISION DENYING MS. PUTMAN'S CLAIMS

In his September 2013 decision denying Ms. Putman's claims, the ALJ found that Ms. Putman met the insured status requirement of Title II of the Social Security Act through December 31, 2006. (Admin. Tr. 21). At step one, the ALJ found that Ms. Putman did not engage in substantial gainful activity at any point during the relevant period from July 17, 2001, through December 31, 2006. Id. At step two, the

ALJ found that, through her date last insured, Ms. Putman had the following medically determinable severe impairments: major depressive disorder, and panic disorder.  (Admin. Tr. 21-22).  The ALJ also found that Ms. Putman had the medically determinable but non-severe impairments of hypertension, diabetes mellitus, obesity, degenerative disc disease of the cervical spine, and carpal tunnel syndrome.  Id.  The ALJ found that Ms. Putman alleged impairment due to fibromyalgia was not medically determinable.  Id.  At step three the ALJ found that during the relevant period Ms. Putman did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Admin. Tr. 22).

Between steps three and four of the sequential evaluation process, the ALJ assessed Ms. Putman's RFC.  The ALJ assessed that Ms. Putman could perform a full range of work at all exertional levels except that:

> The claimant was limited to exercising only simple work-related judgments.  She was limited to occupations involving only occasional changes to the routine work setting.  The claimant was limited to performing simple, routine, repetitive work in a stable environment.  She was limited to occasional interaction with members of the public, co-workers and supervisors.  Moreover, the claimant was unpredictable unavailable for work an average of one day per month.

(Admin. Tr. 23).  In doing so, the ALJ accorded "limited" weight to the PRT assessment by Dr. Rattan and the medical source statement by Dr. Snelson, and

15

"great" weight to the case analysis by Dr. Fountain.  The ALJ also assessed that Ms. Putman's statements about the intensity, severity, and limiting effects of her impairments were not entirely credible.

The ALJ's assessment at steps four and five of the sequential evaluation process was informed by the testimony of VE Stroud.  VE Stroud testified that an individual of the same age, and with the same education and work experience would not be able to engage in her past relevant work as a home attendant, operations clerk, or teller if she were limited to the above RFC.  (Admin. Tr. 61-62).  Accordingly, at step four the ALJ concluded that Ms. Putman would be unable to engage in her past relevant work.  VE Stroud also testified, however, that such an individual could engage in "other work" including the representative occupations of:  ticketer (DOT #229.587-018), router (DOT #222.587-038), and silver wrapper (DOT #318.687-018).  (Admin. Tr. 63).  VE Stroud's testimony also revealed that these three occupations exist in approximately 745,972 positions in the national economy.  Id. Accordingly, at step five the ALJ concluded that Ms. Putman could adjust to other work that exists in significant number in the national economy despite her impairments.

## B.   EVALUATION OF DAVID PUTMAN'S TESTIMONY

Ms. Putman argues that the ALJ erred by failing to consider and explain his evaluation of the testimony of Ms. Putman's husband, David Putman. (Doc. 13 at 5). Ms. Putman asserts that the ALJ made only a short passing reference to David Putman's hearing testimony in his written decision, and, therefore, did not meet his obligation to consider the statements made by all witnesses and to explain why he credits or rejects those statements. Id. She argues that this error is contrary to the law, and requires remand. (Doc. 13 at 6).

In response, the Commissioner contends that the ALJ's failure to consider and explain David Putman's testimony is harmless error because his testimony was cumulative of Ms. Putman's own statements and would not have changed the outcome in this case. (Doc. 16 at 28-30).

In addition to evidence from "acceptable medical sources" evidence from "other sources" may be used to show the severity of a claimant's impairments and how it affects an individual's ability to function.[1]   SSR 06-03p, 2006 WL 2329939

---

[1]   The Commissioner's regulations define "acceptable medical sources" as licensed physicians, licensed or certified psychologists, licensed optometrists, and qualified speech-language pathologists.  20 C.F.R. §404.1513(a).  Evidence from "acceptable medical sources" is used to establish whether a claimant has a medically determinable impairment.  Id.  Statements by "other sources," or any source that is *not* an acceptable medical source,  may also be used to show the severity of a claimant's impairment and how it affects the claimants ability to work.  20 C.F.R. §404.1513(d);

at *2.  The Commissioner's regulations direct that, in evaluating the extent to which a claimant's subjective testimony concerning the severity and limiting effects can be accepted as true the ALJ shall consider any description "other persons" may provide about how a claimant's symptoms affect his or her activities of daily living and ability to work.  20 C.F.R. §404.1529(c)(1).

Although the Commissioner's regulations relating to the evaluation of opinion evidence do not expressly apply to opinions from "other sources," she has since published guidance that specifies that the factors outlined in 20 C.F.R. §404.1527 represent the basic principles that apply to the consideration of opinions by other sources.  See SSR 06-03p, 2006 WL 2329939 at *4.  "In considering evidence from 'non-medical sources' who have not seen the individual in a professional capacity in connection with their impairments, such as spouses, parents, friends, and neighbors, it would be appropriate to consider such factors as the nature and extent of the

---

SSR 06-03p, 2006 WL 2329939 at *2.  However, statements by "other sources" cannot be used to establish the existence of a medically determinable impairment. SSR 06-03p, 2006 WL 2329939 at *2.  "Other sources" include, but are not limited to:  medical sources who are not acceptable medical sources (i.e., nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists); educational personnel (i.e., school teachers, counselors, early intervention team members, development center workers, and daycare workers); public and private social welfare agency personnel (i.e., rehabilitation counselors); and spouses, parents, caregivers, relatives, friends neighbors, clergy, and employers. 20 C.F.R. §404.1513(d); SSR 06-03p, 2006 WL 2329939 at *2.

18

relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." Id. at 6.  Furthermore, since there is a requirement that the ALJ must consider all relevant evidence in a claimant's case record, the ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case."  Id.  Courts have found a basis for remand in some circumstances where an ALJ failed to consider other lay source statements under certain circumstances. However,

> in this Circuit, "many courts have found that an ALJ's failure to address lay opinion testimony, although technically in violation of applicable legal standards, [does] not require remand since the testimony would not have changed the outcome of the case." Butterfield v. Astrue, No. 06–0603, 2011 WL 1740121, at *6 (E.D.Pa. May 5, 2011) (collecting cases).  This is particularly true where the lay testimony the ALJ failed to address was cumulative of other evidence in the record. See, e.g., Dolbow v. Astrue, 799 F.Supp.2d 319, 330 (D.Del.2011); Bailey v. Astrue, No. 07–4595, 2009 WL 577455, at *11 (E.D.Pa. Mar.4, 2009); Carnes v. Comm'r of Soc. Sec., No. 08–99, 2008 WL 4810771, at *5 (W.D.Pa. Nov.4, 2008).

Brandt v. Colvin, No. 3:13-cv-02165, 2014 WL 4793956 at *6 (M.D.Pa. Sept. 24, 2014).

In this case, judged by these legal guideposts, we are constrained to agree with the Commissioner that the ALJ's failure to expressly assign a particular weight to David Putman's hearing testimony does not undermine the ALJ's ultimate conclusion. First, we note that although the ALJ did not articulate what weight was accorded to David Putman's testimony, he discussed the testimony offered at the hearing about Ms. Putman's limitations, and did make specific reference to David Putman's testimony. (See Admin. Tr. 24). Furthermore, David Putman's testimony is, in large part, cumulative of Ms. Putman's own testimony. Accordingly, because David Putman's testimony is essentially cumulative of Ms. Putman's testimony – which the ALJ found to be less than fully credible – and because we have found that the ALJ's decision was supported by substantial evidence in all other regards, we find that remanding this matter for further evaluation of David Putman's testimony would not change the outcome in this case. Therefore, in this case we join " 'many courts [that] have found that an ALJ's failure to address lay opinion testimony, although technically in violation of applicable legal standards, [does] not require remand since the testimony would not have changed the outcome of the case.' Butterfield v. Astrue, No. 06–0603, 2011 WL 1740121, at *6 (E.D.Pa. May 5, 2011) (collecting cases). This is particularly true where the lay testimony the ALJ failed to address was cumulative of other evidence in the record. See, e.g., Dolbow v. Astrue, 799

20

F.Supp.2d 319, 330 (D.Del.2011); <u>Bailey v. Astrue</u>, No. 07–4595, 2009 WL 577455,

at *11 (E.D.Pa. Mar.4, 2009); <u>Carnes v. Comm'r of Soc. Sec.</u>, No. 08–99, 2008 WL

4810771, at *5 (W.D.Pa. Nov.4, 2008)." <u>Brandt v. Colvin</u>, No. 3:13-cv-02165, 2014

WL 4793956 at *6 (M.D.Pa. Sept. 24, 2014).

## C.   THE ALJ'S ASSESSMENT OF MS. PUTMAN'S PHYSICAL IMPAIRMENTS

Ms. Putman argues that the ALJ's RFC assessment is defective because he

failed to account for the limiting effects of the following medically determinable non-

severe physical impairments:  hypertension, diabetes mellitus, obesity, degenerative

disc disease of the cervical spine, and carpal tunnel syndrome.  (Doc. 13 at 6-8).  In

response the Commissioner asserts that the ALJ's RFC assessment adequately

accounted for all of the functional limitations that were supported by the record.

(Doc. 6 at 22).

As noted by the Commissioner, Ms. Putman supports this argument by merely

pointing to the diagnoses of various physical conditions, without discussing what, if

any,  limitations they cause.  In support of her argument, Ms. Putman relies on SSR

96-8p, which provides that:

> In assessing RFC, the adjudicator must consider limitations and
> restrictions imposed by all of an individual's impairments, even those
> that are not "severe."  While a "not severe" impairment(s) standing
> alone may not significantly limit an individual's ability to do basic work
> activities, it may--when considered with limitations or restrictions due

> to other impairments--be critical to the outcome of a claim. For
> example, in combination with limitations imposed by an individual's
> other impairments, the limitations due to such a "not severe" impairment
> may prevent an individual from performing past relevant work or may
> narrow the range of other work that the individual may still be able to
> do.

1996 WL 374184 at *5. This principle is further underscored by 20 C.F.R. §404.1545(a)(2), which provides that "[w]e will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' . . . when we assess your residual functional capacity."

The same ruling upon which Ms. Putman relies, however, provides that "when there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." SSR 96-8p, 1996 WL 374184 at *3. Ms. Putman has failed to point to any evidence that the diagnoses identified above actually resulted in any limitation or restriction related to any functional capacity. Accordingly, in the absence of such a showing, we are compelled to find that her argument lacks merit.

### D.   SSR 00-4p, AND THE ALLEGED CONFLICT BETWEEN VE STROUD'S TESTIMONY AND THE DICTIONARY OF OCCUPATIONAL TITLES

Next Ms. Putman alleges that the ALJ was prohibited from relying on the testimony of VE Stroud because the ALJ failed to resolve a conflict between VE Stroud's testimony and the Dictionary of Occupational Titles ("DOT") in violation of SSR 00-4p.  (Doc. 13 at 8-10).  In response the Commissioner argues that to the extent there was any conflict, the ALJ properly resolved it.  (Doc. 16 at 25).

SSR 00-4p provides that:

> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled.  At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

2000 WL 1898704 at *2.

Ms. Putman's claimed challenge to the ALJ's compliance with SSR 00-4p relates to VE Stroud's testimony on the issue of productivity limitations (i.e., workplace absences) and the extent to which such limitations are tolerated in a competitive work environment.  This conflict arises because the DOT does not discuss the minimum productivity/attendance requirements that an individual must

meet in order to meet the demands of competitive employment.  Ms. Putman asserts

that the ALJ recognized this conflict in his decision, but did not elicit sufficient

explanation resolving the conflict.  We disagree.

SSR 00-4p provides several examples of "reasonable explanations" for

conflicts which may provide a basis for relying on VE testimony, rather than DOT

information, including:

> Evidence from VEs or VSs can include information not listed in the
> DOT.  The DOT contains information about most, but not all,
> occupations.  The DOT's occupational definitions are the result of
> comprehensive studies of how similar jobs are performed in different
> workplaces.  The term "occupation," as used in the DOT, refers to the
> collective description of those jobs.   Each occupation represents
> numerous jobs.  Information about a particular job's requirements or
> about occupations not listed in the DOT may be available in other
> reliable publications, information obtained directly from employers, or
> from a VE's or VS's experience in job placement or career counseling.

2000 WL 1898704 at *2.   In this case, the information at issue – the number of

absences per month that would be tolerated in competitive employment – is not listed

in the DOT.  Further, VE Stroud explained that, instead, she formulated her opinion

that a typical employer would not tolerate more than one absence per month on a

combination of statistic from the Bureau of Labor Statistics and her own experience.

As such, we find that the ALJ did not run afoul of SSR 00-4p when he relied on VE

Stroud's testimony.

## E.    THE ALLEGED ERROR AT STEP THREE – LISTINGS 12.04 AND 12.06

Next, Ms. Putman alleges that the ALJ erred by concluding that she did not

meet the criteria of Listing 12.04 and 12.06 of 20 C.F.R. Part 404, Subpart P,

Appendix 1.[2]  step three of the evaluation process, the ALJ must determine whether

a claimant's alleged impairment is equivalent to a number of listed impairments that

are acknowledged as so severe as to preclude substantial gainful activity.  20 C.F.R.

§404.1520(a)(4)(iii); 20 C.F.R. Part 404, Subpart P, Appendix 1; Burnett, 220 F.3d

at 119.  In making this determination, the ALJ is guided by several basic principles

set forth by the Social Security regulations, and case law.  First, if a claimant's

impairment meets or equals one of the listed impairments, the claimant is considered

disabled *per se*, and is awarded benefits.  20 C.F.R. §404.1520(d); Burnett, 220 F.3d

at 119.  However, to qualify for benefits by showing that an impairment, or

combination of impairments, is equivalent to a listed impairment, Plaintiff bears the

burden of presenting "medical findings equivalent in severity to *all* the criteria for the

---

[2]Listing 12.04 and 12.06 each consist of a statement describing the disorders addressed by the listing, paragraph A criteria (a set of medical findings), paragraph B criteria (a set of impairment-related functional limitations), and paragraph C criteria (additional functional criteria).  20 C.F.R. Part 404, Subpart P, Appendix 1 §12.00A. A claimant can meet this listing by satisfying either the paragraph A and B criteria, or the paragraph A and C criteria.    Id.  Ms. Putman alleges that she satisfies the paragraph A and B criteria.  Because we find that the ALJ's assessment that Ms. Putman does not meet the paragraph B criteria is supported by substantial evidence, we need not address the issue of whether Ms. Putman meets the paragraph A criteria.

one most similar impairment." <u>Sullivan v. Zebley</u>, 493 U.S. 521, 531 (1990); 20

C.F.R. §404.1520(d).  An impairment, no matter how severe, that meets or equals

only some of the criteria for a listed impairment is not sufficient.  <u>Id.</u>

In order to meet the paragraph B criteria of listings 12.04 or 12.06 a claimant

must prove that he or she meets two of the following:  marked restriction of activities

of daily living;  marked difficulties in maintaining social functioning;  marked

difficulties in maintaining concentration, persistence or pace, and repeated episodes

of decompensation, each of extended duration.  20 C.F.R. Part 404, Subpart P,

Appendix 1 §§12.04, 12.06.  Ms. Putman argues that the ALJ erred by finding that

she had only moderate difficulties engaging in activities of daily living, maintaining

social functioning, and maintaining concentration, persistence or pace.  She argues

that the record clearly demonstrates that she suffered from marked difficulty engaging

in activities of daily living, maintaining social functioning, and maintaining

concentration, persistence or pace.  In response the Commissioner argues that the

ALJ's determination that Ms. Putman did not have a "marked" limitation in any of the

paragraph B criteria is supported by substantial evidence.

### 1.   ACTIVITIES OF DAILY LIVING

20 C.F.R. Part 404, Subpart P, Appendix 1 ("listing of impairments") provides

that activities of daily living include:

> adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.

20 C.F.R. Part 404, Subpart P, Appendix 1 §12.00C1. In his decision, the ALJ found that:

> In activities of daily living, the claimant had moderate restriction. Although she alleged that she does not handle stress well at all, the claimant noted that she drives a car and prepares her own meals. She also noted that she has no problem with personal care.

(Admin. Tr. 22). The ALJ also noted that Ms. Putman "managed by herself during her husband's two week work-related trips away from home," had joint custody of her deceased daughter's son, flew unaccompanied from Kuwait to the United States at least twice during the relevant period, and baked the cake for her son's wedding. (Admin. Tr. 24).

We agree with the Commissioner that the ALJ's determination that Ms. Putman did not have "marked" difficulty in activities of daily living is supported by substantial evidence. The record reflects that Ms. Putman was able to travel internationally without assistance, (Admin. Tr. 47), drive alone, (Admin. Tr. 54), do laundry, (Admin Tr. 55), prepare her own meals, (Admin Tr. 189), and maintain her

27

own personal care, (Admin Tr. 188). The record also reflects that Ms. Putman reported that she could shop in stores, handle her own money, maintain her home, and was responsible for caring for her husband and children. (Admin. Tr. 187-94). The Commissioner also accurately notes that, although Ms. Putman cites to more recent medical records that could be found to suggest a greater degree of limitation in this area, these records are far outside the relevant period.

## 2.   MAINTAINING SOCIAL FUNCTIONING

The listing of impairments provides that maintaining social functioning refers to a claimant's:

> capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities. We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity. Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.

20 C.F.R. Part 404, Subpart P, Appendix 1 §12.00C2.

In his decision the ALJ found that:

> In social functioning, the claimant had moderate difficulties. Although she alleges that she goes for days at a time when she cannot leave home, the claimant stated that she does to church and spends time with others. She also stated that she has no problems getting along with family, friends, neighbors or others.

(Admin. Tr. 22). The ALJ also noted that Ms. Putman helped both of her sons plan and decorate for their weddings. (Admin. Tr. 24).

We agree with the Commissioner that the ALJ's determination that Ms. Putman did not have "marked" difficulty in maintaining social functioning is supported by substantial evidence. The record reflects that while in Kuwait Ms. Putman went to lunch with friends, (Admin Tr. 55), tried to get out of her house every day, Id., and reported that although she disliked crowds she had no difficulty getting along with others. (Admin. Tr. 193). She also reported that she continued to engage in other social activities including talking on the phone or meeting a friend for coffee once or twice per week. (Admin. Tr. 191). The Commissioner also accurately notes that, although Ms. Putman cites to more recent medical records that could be found to suggest a greater degree of limitation in this area, these records are far outside the relevant period.

### 3.   MAINTAINING CONCENTRATION, PERSISTENCE, OR PACE

The listing of impairments provides that maintaining concentration, persistence or pace refers to, "the ability to sustain focused attention and concentration

sufficiently long to permit the timely and appropriate completion of tasks commonly

found in work settings."  20 C.F.R. Part 404, Subpart P, Appendix 1 §12.00C3.

In his decision the ALJ found that:

> With regard to concentration persistence or pace, the claimant had moderate difficulties.  Although Gregory Montoya, M.D., a treating psychiatrist, observed that the claimant has psychomotor slowing, the claimant indicated that she finishes what she starts but that sometimes it takes longer.  She also indicated that she reads books, watches DVD's and does small sewing projects.

(Admin. Tr. 22).

We agree with the Commissioner that the ALJ's determination that Ms. Putman

did not have "marked" difficulty in maintaining concentration, persistence or pace is

supported by substantial evidence.  The record reflects that Ms. Putman did, on one

occasion, exhibit psychomotor slowing, this episode occurred during a brief period

when Ms. Putman mistakenly discontinued one of her anti-depressant medications.

(Admin. Tr. 373).  Furthermore, Ms. Putman did report that she enjoys, and is able

to read books, watch DVDs, study genealogy, bake, and complete small sewing

projects on a daily and weekly basis.  (Admin. Tr. 191).  Ms. Putman also reported

that she can pay attention for "average time," and finishes what she starts even though

some tasks taker her longer than average to complete.  (Admin. Tr. 192).  The

Commissioner also accurately notes that, although Ms. Putman cites to more recent

medical records that could be found to suggest a greater degree of limitation in this area, these records are far outside the relevant period.

In sum, while we have great empathy for the tragedy borne by Ms. Putnam and her family since 2001, our responsibility in this setting is to determine whether the ALJ erred in assessing the evidence under a very deferential standard of review, one which requires less than a preponderance of the evidence, but more than a scintilla of proof. When we apply this standard of proof to the instant case, we are constrained to conclude that the ALJ's decision satisfied this modest threshold of proof, and must, therefore, be affirmed.

## IV.   CONCLUSION

Based on the foregoing, the Commissioner's decision shall be AFFIRMED, and Ms. Putnam's requests for relief shall be DENIED.

An appropriate order shall follow.

*S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

Dated: April 4, 2016

31

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THERESA J. PUTMAN,** | : | **Civil No. 3:15-CV-412** |
| | : | |
| **Plaintiff,** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **v.** | : | |
| | : | |
| **CAROLYN W. COLVIN,** | : | |
| | : | |
| **Defendant.** | : | |

## ORDER

**AND NOW**, this 4th day of April 2016, in accordance with the accompanying

Memorandum Opinion, **IT IS HEREBY ORDERED THAT:**

1. The Clerk of Court shall enter final judgment **AFFIRMING** the decision of

the Commissioner of Social Security; and

2. The Clerk of Court shall **CLOSE** this case.


*S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge